## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANA LUZ FIGUEROA,** | : | **Civil No. 1:22-CV-194** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | **(Magistrate Judge Carlson)** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.  Introduction

In the instant case we most assuredly do not write upon a blank slate. Quite the contrary, this Social Security appeal calls upon us to evaluate the second Administrative Law Judge (ALJ) decision relating to Ms. Figueroa's disability claim, the initial ALJ decision having been remanded by the Social Security Appeals Council due to what the Commissioner conceded was a wholly inadequate consideration of Mr. Figueroa's use of a walker to ambulate.

With respect to this question of whether Ana Figueroa used a walker on occasion to ambulate and whether her treating physician deemed a walker to be medically necessary for the plaintiff, the record is largely undisputed. Thus, Figueroa testified to her need for a walker. The evidence also discloses that Figueroa's treating

1

rheumatologist prescribed a walker for her in March of 2019 after a treating physician assistant found that: "She could benefit from using a walker to help minimize pain while walking and add stability as she is a fall risk." (Tr. 1592). Moreover, Figueroa's treatment and examination records are replete with entries reflecting her use of a walker to ambulate. (Tr. 604, 1606, 1609, 1612, 1615, 1618, 1624, 1627, 1630, 1631-32, 1634, 1650, 1657). Indeed, even those medical sources who opined that Figueroa could perform some work also documented her use or intermittent use of a walker to ambulate. (Tr. 533, 604). Thus, as to this issue the record was clear, and clearly indicated that Figueroa often used a walker after her treating physician found that an assistive device was medically necessary.

Notwithstanding this body of evidence which consistently documented Figueroa's use and her medical need for a walker, in the ALJ's second decision denying the plaintiff's application for benefits the ALJ concluded that the "medical evidence of record does not support her alleged limitations and her need to use a walker." (Tr. 31). Having dismissed Figueroa's well-documented and medically prescribed use of a walker to ambulate, the ALJ then crafted an RFC for the plaintiff which required her to do tasks which a person limited to a walker could not perform. Specifically, the ALJ found that Figueroa:

> [H]as the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently lift and/or

2

carry up to 10 pounds and occasionally lift and/or carry up to 20
pounds. She can stand and/or walk for 4 hours and sit for 4 hours per 8-
hour workday with normal breaks. She can occasionally climb ramps
and stairs, balance, stoop, kneel, crouch, and crawl . . . .

(Tr. 27).

Figueroa now appeals this decision, arguing, in part, that the ALJ erred  for a

second time in evaluating her use of a walker to ambulate. While we do not in any

way minimize the difficulty of the task confronting the ALJ in this case, we believe

that this contention has merit and warrants a remand for further consideration of this

case by the Commissioner. We reach this conclusion mindful of the fact that Social

Security appeals are judged by a deferential standard of review, but the courts have

imposed a clear burden of articulation upon an ALJ in order to facilitate this review.

At a minimum, this articulation responsibility means that the ALJ's decision must

provide a logical nexus between any factual findings and ultimate functional

capacity and disability determinations. This principle applies with particular force to

cases involving claimants who may have a medical need for a walker or other

assistive device. Because the use of a walker to ambulate may significantly

undermine the ability to work, courts have held that where a claimant has been

deemed by a physician to medically require a walker, and a vocational expert has

opined that use of the assistive device in combination with other impairments could

render the claimant unemployable, the ALJ must make specific, well-articulated

3

findings in order to deny the claim for benefits. Failure to fully address this issue may compel a remand of the case for further consideration by the Commissioner.

So it is here.

In our view, given the evidence which reveals that Figueroa was prescribed a walker to ambulate and routinely used that walker, more is needed here to justify the ALJ's decision which fashioned an RFC for Figueroa which ignored her need for a walker and instead required her to stand and/or walk for 4 hours during an 8-hour workday, and mandated that she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Indeed, in similar circumstances we have held that when an ALJ crafts an RFC for a claimant that includes significant mobility requirements, without accounting for her need for a walker, a remand is warranted. See Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *9 (M.D. Pa. June 1, 2020). Accordingly, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II.   **Factual Background an Procedural History**

### A. **Medical Evidence Regarding Figueroa's Use of a Walker**

The appeal raises a host of legal issues. However, because we have determined that a remand is necessary due solely to the failure to adequately address the plaintiff's need to use a walker in the workplace, a matter which did not receive

4

sufficient consideration in the ALJ's decision, we will focus upon this issue when assessing the medical evidence.

On January 5, 2017, Ms. Figueroa applied for disability and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act, alleging an onset of disability beginning on February 3, 2016. (Tr. 149). Figueroa was born in 1967 and was a person closely approaching advanced age by the time of the administrative adjudication of her claim. (Tr. 32, 134). She had a high school education and past work experience as a teacher's aide and clerk. (Tr. 32).

In her disability application Ms. Figueroa cited a cascading array of impairments which she submitted combined to render her disabled. These impairments included Sjorgen's Syndrome, Lupus, Fibromyalgia, Obesity, Dysphagia, Knee Osteoarthritis and Tendonitis, and history of Carpal Tunnel Syndrome, status post release surgery. (Tr. 24). A number of these medical conditions significantly limited Figueroa's ability to ambulate and required Figueroa to frequently use a walker.

At two separate disability hearings conducted on June 4, 2019 and December 14, 2020, Ms. Figueroa testified concerning her severely limited mobility as a result of her impairments. (Tr. 53-55, 82-85). In her testimony, Ms. Figueroa consistently stated that she required the assistance of a walker to move about her home and

ambulate outside the home. (Id.) According to Figueroa, the walker was prescribed for her by her treating rheumatologist, Dr. Olsen, in 2019. (Id.) Ms. Figueroa stated that she could stand only for very brief periods without the assistance of the walker, could stand for approximately twenty minutes at a time even with the aid of the walker, and used the walker to assist her when engaging in many routine activities of daily living such as cooking, laundry, and groceries. (Tr. 53-55).

Mr. Figueroa's testimony on this score was consistent with the information provided by her treating rheumatologist, Dr. Nancy Olsen. Dr. Olsen had an extensive clinical history with the plaintiff having treated Figueroa since 2012. (Tr. 1647). Based upon this long-term treatment relationship, Dr. Olsen had determined in 2019 that the use of a walker was medically necessary for Figueroa. Specifically, on March 18, 2019, a physician assistant working in conjunction with Dr. Olsen reported that: "She could benefit from using a walker to minimize pain while walking and add stability as she is a fall risk. Placed order for walker today." (Tr. 1591). Dr. Olsen endorsed this treatment plan and prescription for a walker on March 20, 2019. (Tr. 1591, 1593).

Dr. Olsen's treating source opinion that Figueroa needed a walker to ambulate was reaffirmed by numerous clinical records, which frequently documented her use of the walker. In fact, Figueroa's treatment records are replete with references to her

6

need to use a walker to ambulate. (Tr. 1606, 1609, 1612, 1615, 1618, 1624, 1627, 1630-32, 1634, 1650, 1657).

During this time frame, Figueroa treated extensively with several physicians, including Dr. Olsen, Dr. Lance Yarus, and Dr. Nikkole Haines. The clinical records of these doctors all confirmed Figueroa's on-going need to use a walker to ambulate. For example, on May 13, 2019, Dr. Olsen and Physician Assistant Jennifer Merris reported that: "Ms. Figueroa presents with R[ight] sided knee pain, which has improved since last office visit due to PT and use of walker. She still reports worsening pain when walking." (Tr. 1630). Upon examination, it was observed that Figueroa's gait was "slow with assistance of walker." (Tr. 1631). Accordingly, Figueroa was advised by her treating caregivers to "[c]ontinue with walker." (Tr. 1632).

A second treating source, Dr. Lance Yarus, also thoroughly documented Figueroa's use of a walker to move about during this period. Thus, on March 26, 2019, Dr. Yarus treated Figueroa and reported that she rated her pain level at that time as 8/10. The doctor's notes also confirmed that Figueroa was using a rolling walker to ambulate. (Tr. 1634). Two week later, on April 11, 2019, Dr. Yarus opined that due to these mobility issues and joint pain, Figueroa was "totally disabled from work activities." (Tr. 544). Dr. Yarus' April 30, 2019 treatment notes indicated that

7

Figueroa had attempted to return to work but found that it was too painful. (Tr. 1627). According to Dr. Yarus, at that time Figueroa was using a walker. (Id.) On June 18, 2019, Dr. Yarus' treatment notes indicated that Figueroa rated her pain at an eight on a ten point scale. (Tr. 1624). Figueroa reportedly was still using a rolling walker to help her move about. (Id.) According to Dr. Yarus, on July 23, 2019, Figueroa was engaging in aqua therapy to attempt to relieve her mobility issues and was using a rolling walker to assist her ambulation. On August 27, 2019, October 15, 2019, and November 19, 2019, Dr. Yarus described Figueroa's ongoing mobility impairments and treatment stating that she was undertaking physical therapy and used a walker. (Tr. 1612, 1615, 1618). During a December 17, 2019, clinical encounter Dr. Yarus reported that Figueroa's chronic pain "improves using her sitting walker." (Tr. 1609). Likewise on February 11, 2020, Dr. Yarus, who was treating Figueroa for right knee derangements, observed that she continued to use a rolling walker. (Tr. 1606).

Yet another treating source, Dr. Nikkole Haines, further documented Figueroa's use of a walker in the spring of 2019. Thus, on April 5, 2019, Dr. Haines' treatment notes indicated that Figueroa had been using a walker for several weeks. (Tr. 1657). Moreover, in June of 2019, Dr. Haines noted that: "She does use a walker

8

for mobilization. The patient does have an elevated BMI. She walks with an antalgic gait favoring the right side." (Tr. 1650).

Furthermore, on December 9, 2020, Dr. Olsen, Figueroa's rheumatologist, specifically opined that Figueroa's impairments were disabling. (Tr. 1647-48). In this medical source statement of ability to do work, Dr. Olsen noted her longstanding treatment relationship with Figueroa, stating that she had cared for the plaintiff for nearly nine years since 2012. (Id.) From this longitudinal treatment perspective, Dr. Olsen concluded that Figueroa could only sit for two to four hours during a workday. (Tr. 1647). Moreover, according to the doctor Figueroa could stand or walk for only one hour per day because she "needs to use a walker." (Id.) Dr. Olsen also opined that Figueroa would require unscheduled breaks on an hourly basis at work and would miss four days or more of work per month, explaining that these conclusions were based upon the doctor's observation of the plaintiff's use of a walker to ambulate. Specifically, Dr. Olsen reported that "when she dropped off this form she had significant difficulty ambulating and was using a walker." (Tr. 1648).

Arrayed against this consistent, congruent body of treating source clinical and opinion evidence, the ALJ's decision cited one countervailing view, the opinion of a doctor who saw Figueroa on a single occasion for less than an hour as part of a consultative examination in a worker's compensation proceeding. Dr. John Kline

met with Figueroa on January 22, 2019, for approximately 50 minutes as part of a consultative examination. (Tr. 531). While Dr. Kline opined based upon this single isolated encounter which took place prior to Figueroa being prescribed a walker that she " would be capable of working full-time, full duty without restriction," (Tr. 539), the doctor's report was noteworthy in several respects. Dr. Kline acknowledged that Figueroa may have "the intermittent need to utilize an assistive device to assist her with ambulation," even though she had not presented with such a device. (Tr. 533). Further, Dr. Kline observed that "Ms. Figueroa-Santos demonstrated an intermittently antalgic gait." (tr. 535). Thus, the doctor's clinical findings supported the proposition that Figueroa needed to use an assistive device to ambulate, at least on some occasions.

Further, the Figueroa's records identified an additional severe impairment which significantly exacerbated her significant mobility issues—her morbid obesity. Figueroa is five feet three inches tall, but during the pertinent time frame her weight fluctuated between 220 and 260 pounds, resulting in a BMI rating that ranged from 38 to over 46. (Tr. 82, 1556, 1560, 1563, 1580, 1582, 1585, 1587, 1592, 1609, 1615, 1618, 1621, 1624, 1627, 1634, 1658). Figueroa's obesity was a major contributing factor complicating her profound mobility impairments.

10

It was on this medical record—which confirmed Ms. Figueroa's need for a walker, her prescription for a walker, and her frequent use of a walker—that this case came before the ALJ for evaluation and decision.

## B. **Procedural History**

This case has a lengthy procedural history. On January 5, 2017, Ms. Figueroa applied for disability and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act, alleging an onset of disability beginning on February 3, 2016. (Tr. 149). In her disability application, Ms. Figueroa stated that she was disabled due to the combined impact of the following severe impairments: Sjorgen's Syndrome, Lupus, Fibromyalgia, Obesity, Dysphagia, Knee Osteoarthritis and Tendonitis, and history of Carpal Tunnel Syndrome, status post release surgery. (Tr. 24). Figueroa's initial disability hearing was conducted on June 4, 2019. (Tr. 72-105). At this hearing Figueroa testified that, as a result of her impairments, she had been prescribed and had constantly used a walker to ambulate at home and when she left the home. (Tr. 84-85). A vocational expert who appeared and testified at this hearing opined that Figueroa's use of a walker would render her unemployable. (Tr. 101).

Notwithstanding this evidence, on July 11, 2019, an ALJ entered a decision denying Figueroa's disability application. (Tr. 143-58). In this decision the ALJ

found that Figueroa retained the residual capacity to perform a range of light work.
(Id.) However, the ALJ's decision paid scant attention to Figueroa's need for a
walker, made no mention of the clinical evidence supporting the medical necessity
for a walker, and failed to adequately address how Figueroa's obesity compounded
her mobility concerns. (Id.) Consequently, when Figueroa challenged this ruling
before the Social Security Appeals Council, the Appeals Council concluded that the
treatment of Figueroa's obesity and the consideration of her need to use a walker to
ambulate was wholly inadequate. (Tr. 161-62). Therefore, the Appeals Council
remanded this case with the following clear instructions:

> Upon remand the Administrative Law Judge will:
>
> ● Obtain additional evidence concerning the claimant's severe
> impairments in order to complete the administrative record in
> accordance with the regulatory standards regarding consultative
> examinations and existing medical evidence (20 CFR 404.1512 and
> 416.912). The additional evidence may include, if warranted and
> available, a consultative physical examination and medical source
> opinions about what the claimant can still do despite the impairments.
>
> ● Further evaluate whether the claimant's walker is medically
> necessary and what work-related limitations, if any, would result from
> the claimant's use of the cane in accordance with Social Security Ruling
> 96-9p.
>
> ● Further evaluate the claimant's obesity in accordance with
> Social Security Ruling 19-2p and provide specific rationale that
> addresses the impact of this impairment on the claimant's residual
> functional capacity.

● Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 96-8p).

(Id.)

Upon remand, a second disability hearing was conducted in Figueroa's case on December 14, 2020. (Tr. 40-71). Once again, Figueroa and a vocational expert testified at this hearing. (Id.) In her testimony Ms. Figueroa explained that she had severely limited mobility as a result of her impairments and required the assistance of a walker to move about in her home and ambulate outside the home. (Tr. 53-55). Figueroa reiterated that the walker was prescribed for her by her treating rheumatologist, Dr. Olsen, in 2019 and stated that she could stand only for very brief periods without the assistance of the walker. Further, Figueroa testified that even with the assistance of the walker, she could only stand for approximately twenty minutes at a time and stated that she used the walker to assist her when engaging in many routine activities of daily living such as cooking, laundry and groceries. (Id.) The vocational expert who appeared at this second hearing also testified that, depending upon the extent of Figueroa's reliance upon the walker, she would either be severely limited at work or would be precluded from working. (Tr. 100-01).

Four months later, on April 5, 2021, the ALJ entered a second decision in this case denying Figueroa's disability application. (Tr. 15-34). In this second ALJ

decision, the ALJ found that Figueroa retained the following residual functional

capacity:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently lift and/or carry up to 10 pounds and occasionally lift and/or carry up to 20 pounds. She can stand and/or walk for 4 hours and sit for 4 hours per 8- hour workday with normal breaks. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, never climb ladders, ropes, or scaffolds, avoid concentrated exposure to extreme humidity, cold, heat, irritants (such as odors, dusts, gases, fumes, chemicals), and poorly ventilated areas.

(Tr. 27).

This RFC—which called for Figueroa to stand or walk for four hours a day

and climb ramps and stairs, balance, stoop, kneel, crouch, and crawl—made no

provision whatsoever for Figueroa's medically prescribed walker. The ALJ justified

this decision to completely discount Figueroa's thoroughly documented use of a

medically prescribed walker by simply asserting that "the objective medical

evidence of record does not support her alleged limitations and her need to use a

walker." (Tr. 31). According to the ALJ, the extensive medical documentation which

consistently described Figueroa's use of a walker over two years was merely an

"inconsistent presentation in terms of gait and use of an assistive device." (Id.)

The ALJ also afforded only limited weight to the opinion of Dr. Olsen, the

treating rheumatologist who had cared for Figueroa for nearly nine years, had

14

prescribed Figueroa's walker, and opined that she was disabled. The ALJ largely discounted Dr. Olsen's treating source perspective, reasoning that "her . . . opinion is not consistent with the objective evidence of record, including her own treatment records." In reaching this result the ALJ did not further explain why the plethora of treatment records documenting Figueroa's need to use a walker were inconsistent with Dr. Olsen's findings. Instead, the ALJ gave significant weight to the opinion of Dr. Kline, who had met Figueroa one time for less than an hour in January of 2019 prior to Figueroa being prescribed a walker. (Tr. 30). Yet, even as the ALJ purported to give this medical opinion significant weight in this disability analysis, the ALJ dramatically departed from Dr. Kline's recommendations. Dr. Kline opined based upon this single isolated encounter that Figueroa "would be capable of working full-time, full duty without restriction." (Tr. 539). Yet, the ALJ determined that Figueroa could only perform a limited range of light work, a restrictive RFC which seemed entirely at odds with Dr. Kline's opinion that she could work full-time, full duty without restriction.

Having reached this RFC determination which rejected the treating source opinion and discounted the extensive clinical evidence regarding Figueroa's use of a walker, the ALJ concluded at Step 4 that Figueroa was capable of performing her past relevant work and denied this disability application. (Tr. 32-34). This appeal

followed. (Doc. 1). On appeal, Figueroa raises a host of challenges to the ALJ's decision, and specifically argues that the ALJ failed to adequately address the limitations which her prescribed use of a walker at work would create. We find that the ALJ's analysis of this issue is deficient in that it makes no provision for Figueroa's thoroughly documented and medically prescribed need to use a walker. On these facts, as discussed below, we conclude that the ALJ's burden of articulation has not been met in this appeal, and therefore this case will be remanded for further consideration and evaluation of the medical evidence.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

16

Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

 The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."

> <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.   42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age,

education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),   404.1545(a)(1),   416.920(e),   416.945(a)(1).   In   making   this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of

independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

C.    **Duty of Articulation – Claimant's Use of a Walker**

Cases considering a claimant's use of a walker or assistive device to ambulate aptly illustrate the importance of the ALJ's duty to clearly articulate the rationale for a decision denying disability benefits. Case law and Social Security regulations both recognize that a claimant's need to use an assistive device to ambulate can dramatically and adversely affect the ability to perform work on a sustained basis. Accordingly, in certain instances, the use of a walker to ambulate can be outcome determinative in a Social Security appeal.

At the outset, in order to rely upon evidence regarding the use of a walker to sustain a disability claim, the assistive device must be medically necessary.

> " 'To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed [.]' Social Security Ruling 96–9p." Howze v. Barnhart, 53 Fed.Appx. 218, 222 (3d Cir. 2002). In short
>
> > Social Security regulations provide that an ALJ will not accommodate the use of a cane unless the claimant first provides "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed[.]" SSR 96–9p. Absent such documentation, an ALJ need not accommodate the use of a cane in a residual functional capacity assessment, even if the claimant was prescribed a cane by a doctor. See, Howze v. Barnhart, 53 Fed.Appx. 218, 222 (3d Cir. 2002).

25

Williams v. Colvin, No. 3:13-CV-2158, 2014 WL 4918469, at *10
(M.D. Pa. Sept. 30, 2014).

Phillips v. Colvin, No. 1:16-CV-1033, 2017 WL 3820973, at *9 (M.D. Pa. Aug. 16,

2017), report and recommendation adopted sub nom. Philips v. Colvin, No. 1:16-

CV-1033, 2017 WL 3780138 (M.D. Pa. Aug. 31, 2017).

However, if the claimant makes this threshold showing of medical necessity,

then it is incumbent upon the ALJ to directly "address the evidence concerning

Plaintiff's use of" the assistive device. Steward v. Comm'r of Soc. Sec., No. CIV.A

08-1741, 2009 WL 1783533, at *5 (W.D. Pa. June 23, 2009). Moreover, the failure

to do so may require a remand. Id. Likewise, when the evidence indicates that the

use of a walker is medically required and a vocational expert testifies that the

plaintiff's use of an assistive device would render her unable to work, it is error for

the ALJ to fail to set forth the reasons for rejecting this expert testimony, and the

case should be remanded. Altomare v. Barnhart, 394 F. Supp. 2d 678, 682 (E.D. Pa.

2005). In short, where substantial evidence indicates that there is a medical need for

a claimant to use a walker or assistive device, and a vocational expert testified that

such use significantly erodes the employment base for a claimant, the failure to

adequately address these issues constitutes a failure of articulation by the ALJ

warranting a remand. See e.g., Graver v. Colvin, No. 3:13CV1811, 2014 WL

1746976, at *5 (M.D. Pa. May 1, 2014); Butler v. Astrue, No. CIV.A. 11-376, 2012

WL 1252758, at *7 (W.D. Pa. Apr. 13, 2012). These principles which recognize the limiting effects of a an assistive on employment apply with particular force in a case such as this when an ALJ crafts an RFC for a claimant that includes significant mobility requirements, without accounting for her need for a walker. See Dieter, 2020 WL 2839087, at *9.  In such instances a remand may be necessary.

### D. **Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence**

Furthermore, the Commissioner's regulations that were in effect at the time that Figueroa filed this application in January 2017 also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL

27

374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These

benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)(citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(citations omitted); See also Brownawell v. Commissioner of Social Security, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence

and not due to his or her own credibility judgments, speculation, or lay opinion." <u>Morales v. Apfel</u>, supra at 317 .

<u>Morder v. Colvin</u>, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24, 2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion, and substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ typically may only discount such an opinion when it conflicts with other objective tests or examination results. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. <u>Torres v. Barnhart</u>, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." <u>Tilton v. Colvin</u>, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). However, in all instances in social security disability cases the ALJ's decision, including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Indeed, this principle applies with particular force

to the opinion of a treating physician.  <u>See</u> 20 C.F.R. §404.1527(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'"  <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999)(<u>quoting</u> <u>Mason</u>, 994 F.2d at 1066)); <u>see also</u> <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000). Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

It is against these benchmarks that we assess the instant case.

**E.  <u>This Case Will Be Remanded.</u>**

In this case, we believe that there is an inherent confusion and contradiction in the ALJ's analysis of the issue of whether, and to what degree, Figueroa's use of a walker to stand and ambulate undermined her ability to work. This confusion is, in large measure, a function of the failure of the ALJ to make any provision for Figueroa's use of a walker when crafting an RFC in this case. The RFC's failure to account for this use of an assistive device is curious, since the clinical record is replete with references to Figueroa's use of a walker to stand and walk. (Tr. 1606, 1609, 1612, 1615, 1618, 1624, 1627, 1630-32, 1634, 1647-48, 1650, 1657).

Moreover, it is entirely undisputed that Figueroa's treating rheumatologist, who had nearly nine years of experience caring for the plaintiff, prescribed the use of this walker in March of 2019. (Tr. 1592). Given this uncontested evidence, we believe that the record aptly illustrated the medical necessity for a walker by Figueroa, a fact which the ALJ did not seem to fully recognize. Instead, the ALJ simply found that "the objective medical evidence of record does not support her alleged limitations and her need to use a walker." (Tr. 31). This conclusion is rebutted by the clinical record and, therefore, is not supported by substantial evidence.

This analytical ambiguity was then heightened by the ALJ's treatment of the medical opinion evidence in this case. This medical opinion evidence analysis was flawed in two major ways. First, The ALJ erred in affording only limited weight to Dr. Olsen, the treating rheumatologist who had cared for Figueroa for nearly nine years, had prescribed Figueroa's walker, and had opined that she was disabled. The ALJ discounted this treating source based upon the assertion that "her . . . opinion is not consistent with the objective evidence of record, including her own treatment records." However, the record is replete with specific supporting clinical evidence documenting Figueroa's use of a walker to ambulate. Therefore, Dr. Olsen's opinion drew support from the greater weight of the clinical evidence. Given that the failure on the part of an ALJ to fully articulate a rationale for rejecting the well-supported

opinion of a treating source often compels a remand, the ALJ's rejection of this well-founded treating source opinion was error.

The ALJ then compounded this error by affording significant weight to the opinion of Dr. Kline, a non-treating source who examined Figueroa for less than one hour in January of 2019 prior to her being prescribed a walker. The ALJ's reliance on Dr. Kline's opinion to deny this application for benefits was misplaced for several reasons. First, this reliance runs afoul of the treating source rule which governed the assessment of medical opinion evidence in this case. Second, while the ALJ gave Dr. Kline's opinion significant weight in this disability analysis, the ALJ neglected to focus upon Dr. Kline's findings that Figueroa had an intermittent need to use a walker and displayed an intermittently antalgic gait, factors which actually supported the treating source opinions that she needed a walker to ambulate. Third, the ALJ's analysis ignored the fact that, following Dr. Kline's brief encounter with Figueroa, there were a series of material medical developments in her case, including the decision by Dr. Olsen to prescribe a walker for the plaintiff, and the opinions of two treating physicians, Drs. Olsen and Yarus, that Figueroa was disabled. These later, intervening medical events cast doubt upon the weight that can be given to Dr. Kline's opinion, which was rendered without the benefit of the knowledge of these medical developments. Finally, a careful consideration of the ALJ's decision reveals

an inherent contradiction in the evaluation of Dr. Kline's opinion.  Dr. Kline opined based upon a single isolated encounter with Figueroa that she " would be capable of working full-time, full duty without restriction." (Tr. 539). Yet, while the ALJ professed to give this opinion significant weight, the facts belie this assertion since the ALJ's RFC determination dramatically departed from Dr. Kline's opinion and found that Figueroa could only perform a limited range of light work, a restrictive RFC which is completely at odds with Dr. Kline's opinion that she could work full-time, full duty without restriction.

Given these ambiguities, contradictions and inconsistencies in the ALJ's consideration of Figueroa's need to use a walker at work, more is needed here to sustain the Commissioner's denial of this claim. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This means that there must be a logical nexus between the ALJ's factual findings and legal conclusion. That logical bridge is missing here. On the current record, with respect to the pivotal question regarding how Figueroa's use of a walker to walk and stand undermines her ability to work, the ALJ's burden of articulation is not met. Therefore, this matter will be remanded for further consideration by the Commissioner.

Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, this task should remain the duty and province of the ALJ on remand. Further, having found that a remand is justified on these grounds, we have not addressed any other claimed errors because the ALJ may in the first instance address them upon remand. See McMillan v. Comm'r of Soc. Sec., No. 16-313, 2018 WL 6617841, at *4 (D.N.J. Dec. 18, 2018) (holding the same in finding that a remand was appropriate because the ALJ failed to properly consider the plaintiff's severe obesity impairment at the third step and the fifth step, and thus the Court "need not consider Plaintiff's other arguments at this juncture"); see also Lawrence v. Colvin, No. 15-2851, 2016 WL 1644622, at *10 (D.N.J. Apr. 26, 2016) (holding the same in finding that a remand was appropriate because the ALJ failed to properly consider one of the claimant's disabilities, and thus the ALJ would be required to engage in an entirely new evaluation concerning the claimant's other alleged severe disabilities).

## III.   Conclusion

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 9, 2023.